# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF FLORIDA
# JACKSONVILLE DIVISION

**UNITED STATES OF AMERICA**,

*v.*

**TERESA BRADY**,

    *Defendant.*

Case No. 3:24-cr-251-MMH-SJH

## SENTENCING MEMORANDUM

Defendant Teresa ("Terrie") Brady files this memorandum to assist the Court with the sentencing currently scheduled for **1:30 p.m.** on **February 9, 2026**.

On December 12, 2024, Terrie Brady (the former president of the Duval Teachers United ("DTU")), was charged in a fourteen-count indictment with violations of 18 U.S.C. § 1349 (Wire and Mail Fraud Conspiracy); 18 U.S.C. § 1343 & 2 (Wire Fraud); 18 U.S.C. § 1341 & 2 (Mail Fraud); and 18 U.S.C. § 1957 (Illegal Monetary Transactions). [Doc. 1] All the counts concerned DTU leave time which she cashed in but to which she was not actually entitled. *Id*.

On October 9, 2025, Ms. Brady entered into a Plea Agreement pleading guilty to Counts One, Two, Twelve and Thirteen of the Indictment. [Doc. 72]. The

codefendant, Ruby George, had previously entered into a Plea Agreement with an extensive Factual Basis. [Doc. 52] The George and Brady Agreements differ in various significant ways. Most of these differences are related to the Factual Basis, but the restoration provision (discussed below) is significant.

This memo seeks to show why a sentence of 33 months of probation, with eighteen months of home confinement as a condition of probation, and a monthly restitution obligation of $1,000.00 would be "sufficient but not greater than necessary" to fully meet the purposes of 18 U.S.C. § 3553(a).

> *It has been uniform and constant in the federal judicial tradition*
> *for the sentencing judge to consider every convicted person as an*
> *individual and every case as a unique study in the human failings*
> *that sometimes mitigate, sometimes magnify, the crime and the*
> *punishment to ensue.*
>
> *Koon v. United States*, 518 U.S. 81, 113 (1996).

## PSR ADVISORY GUIDELINES RANGE

The Presentence Investigation Report, using the 2025 Guidelines Manual and amendments, calculated a Total Offense Level of 20. That calculation takes into account:

- the variety and multiplicity of Ms. Brady's offenses;

- the full amount of loss ($2,600,235.99) to the DTU;

- her abuse of the trust the DTU placed in her; and

- her acceptance of responsibility.

With her criminal history of CH I, and the fact that Ms. Brady is a Zero-Point Offender under U.S.S.G. §§ 4C1.1., the PSR calculates an advisory Guidelines range of 33-41 months. PSR ¶¶ 59, 87.

The Defendant has no unresolved objections to the PSR.

## CONSIDERATION OF § 3553(a) FACTORS
### (1) Circumstances and Characteristics

Under 18 U.S.C. § 3553(a)(1), a sentencing court must consider "the nature and circumstances of the offense and the history and characteristics of the defendant."

It is not an overstatement to say that Terrie Brady devoted her life to the welfare of Duval County Public School ("DCPS") teachers and employees. It is therefore tragically sad and ironic that she awaits sentencing for her participation in a conspiracy to take money from the DTU.

*Terrie Brady*

Terrie Brady was born in 1955 in Jacksonville and has lived here her entire life. Her father was a brick mason, and her mother owned a beauty supply business. Raised with her twin sister in a loving blue-collar family, she worked hard in her teen employment opportunities and in high school. Upon graduation from Ed White High School, she attended the University of North Florida and received a degree in Elementary Education in 1977. PSR ¶¶ 66-70, 79.

She has been married to her husband Mark for more than 46 years. For the most part Mark worked in the information technology field until his retirement. *See* PSR ¶ 71. They do not have children. *Id.*

*DCPS and DTU*

From 1979 to 1989, Terrie Brady was employed as a DCPS public school teacher, serving at John Love Elementary school, where she served as PTA President for three years. She loved teaching but also recognized the deep and often unmet needs of her fellow teachers. She believed that these needs could be met in part through the political process, particularly through a strong union working with and within the DCPS.

She left the classroom and spent the next decade of her career (1989-1999) working for the DTU as a staff consultant, advocate and lobbyist. In 1999 she was elected President of the DTU, replacing outgoing President Lynne Lucas. (Ruby George had been Executive Vice President, "EVP," before Terrie Brady was elected President.) Ms. Brady remained in that position until 2023.

The President and EVP had separate responsibilities within the DTU. They did not supervise each other nor did either report to the other. They worked in parallel, but different spheres. Each reported directly to the DTU Board with respect to their areas of responsibility. The President was responsible for political work, labor negotiations and membership. The Executive Vice President was responsible for finances, including (as a very small part of her responsibility) tracking the leave of staff and officers.

Brady was a classic "workaholic" whose devotion to the DTU led her to work holidays, nights and weekends. She is characterized by those she worked with and for as a "fierce, dedicated advocate," whose "work was not bound by a nine-to-five schedule." *See* letters[1] Ex. A-03; A-20 respectively.

One writer explains:

> As head of the Duval County Teacher's Union she was always working. Night and day, seven days a week she was on the phone, frequently on her front steps, trying to solve a problem, always fighting for her teachers. She took her responsibility very seriously. In the thirty years that I have known her she has only taken two vacations.

A-04; *cf.* A-14 ("Terrie worked tirelessly from dawn to dark, 24/7, listening and solving problems").

She was renowned for her accomplishments as DTU President. *See generally* Ex. A-18; A-21; A-22. *See also* A-19 ("When I decided not to run for re-election as President [of the DTU], I felt [confident] that Terrie Brady would be an outstanding President and that the organization would prosper under her leadership. (It has!)").

---

[1] The many individual letters have been indexed and provided directly to U.S. Probation in Exhibit A. [Doc. 95] Quotations from the letters are cited as, *e.g.*, "Ex. A-12," allowing them to be identified through the index. Two letters have inadvertently been labelled A-16, and are referenced as A-16a and A-16b below..

*Leave at the DTU*

As part of their employment packages, DTU staff and officers received a generous leave package of 13 holidays and 42 days of leave annually. This was commensurate with the time off granted to teachers, and the union allowed its employees to save leave (not holidays) and cash it in later.[2] From 1989 on Ms. Brady accumulated thousands of hours of leave.

Though Ms. Brady could request time off or request that leave be cashed in, she did not keep track of her own leave[3] and did not have a precise knowledge of her available leave hours at any given time. There was no standardized monthly report of leave hours, though occasional and sporadic memos did purport to represent the hours available to DTU Officers.[4] Ms. Brady agrees with the Government that these reports were not accurate.

---

[2] When DTU officers cashed in leave, it was at their then-current effective hourly rate. Per the government, Ms. Brady's effective hourly rate varied from $57.70/hour in 2007-2015, to $66.91/hour in 2016, and eventually to $75.15/hour by late 2022. *See* Ex. B, Government Production and Analysis, Item B.06 (produced July 16, 2025).

[3] While Ms. George said that she "tracked her own leave" and asserted that Ms. Brady did so as well [Doc. 52, Factual Basis at 3), this was incorrect as to Brady. Ms. Brady did not track her own leave and this sentence was deleted from the first draft of Doc. 72 as part of Brady's plea negotiations.

[4] *See, e.g.,* Ex. C, Sample Leave Summaries.

Still, by 2003, by the Government's calculation, Terrie Brady had legitimately accumulated over 5000 hours of leave, worth several hundred thousand dollars at her prevailing rate. Doc. 72, Factual Basis at 3; *see also* Ex. B, Government Production and Analysis, Item B.03 (produced July 16, 2025). Accruing new leave at a rate of 336 hours per year (and less hours used and hours sold), according to the Government reconstructions, Ms. Brady did not drop below a balance of 5000 hours until sometime in 2008. *Id*.

According to the DTU Audited Financials, at the end of the 2009 fiscal year, the union had negative net assets of $940,707. *See* Ex. D FY2009, Independent Auditor's Report FY2009 at 3 (Apr. 8, 2010). A substantial portion of this was due to the accrued leave of George and Brady, which had been taken as a prior period adjustment of $468,386. *See* Ex. D FY2008, Independent Auditor's Report FY2008 at 7 (Mar. 11, 2009). The auditors advised the DTU that it should not carry such a large liability on its books. [5] Either the officers should take the

---

[5] *See, e.g.* Ex. D, FY2009, Independent Auditor's Report, Miller Letter to the Board (April 8, 2010) at Bates 000015:

> Terry [sic] Brady and Ruby George currently have $341,076 in accrued vacation. Per the prior year's auditors' discussion with Terry, it appears the recommendation that the Organization adopt a 3-5 year plan to pay off their vacation days to have a remaining amount of vacation time of 200 days has been implemented.

vacation days, or the DTU should buy the leave back when funds were available. It took years for the union to be able to afford to buy back the time.[6]

Over the next two decades (2003-2023), Ms. Brady drew down her leave totals as suggested by the auditors. Per the Government's analysis, at some point in 2013 she had used all of her accrued leave (though she legitimately continued to receive an additional 336 hours every year). Before that point, Ms. Brady was not paid for leave she had not earned.[7]

*The nature and circumstances of the offense*

From early 2013, when Ms. Brady still had a small positive leave balance, until 2023, she continued to cash in leave just as she had legitimately done from 2003-2013. The difference was that she had exhausted the leave to sell and each year she sold more than the 336 hours she had newly earned that year.

---

[6] The union had greatly improved its financial situation during this period. While the union had negative net assets of $940,707 on August 31, 2009, by August 31, 2019 it had positive net assets of $253,531. *Compare* Ex. D, FY2009, Independent Auditor's Report, at Bates 000008 *with* Ex. D, FY2020, Independent Auditor's Report at p. 3.

[7] For Ms. George the point at which her balance was below zero apparently occurred in 2011. *See* Ex. B, Government Production and Analysis, Item A.02 (produced July 16, 2025).

The parties agree that Ms. Brady ultimately received $1,328,695.28 for leave she had not earned. Although Ms. Brady had no spoken agreement with Ms. George, and though she did not know at any given time precisely what her actual leave balance was, she would have known that she could not possibly have earned an additional 19,181 hours.[8]

*A life's work ruined*

For 44 years, public education in Duval County was Terrie Brady's "family," and her "calling"—not just her job. It has been her life's work. Her reputation for intelligence, honesty and integrity allowed her to accomplish much that will now be called into question.

The letters provided to the Court show a woman whose life has been marked by care and compassion, and concern for those in pain and distress. Those who were the recipients of her concern have rallied for her without mini-mizing her offense. *See, e.g.*, Ex. A-08 ("steady in a crisis, thoughtful, organized, and deeply caring"); A-11 ("I stand by her, much like she has stood by me . . . ."). Although they understand what she did, they suggest that her offense is not representative of her life character. *See, e.g.*, Ex. A-12 ("the person I have known

---

[8] This is the government's calculation of the excess leave. *See* Ex. B, Government Production and Analysis, Item B.03.

for many years is someone of good character—passionate, dedicated, honest, and fundamentally concerned with fairness and the welfare of others"); Ex. A-16a ("I understand the seriousness of the matter before the Court and do not seek to minimize it. I respectfully offer this letter to provide insight into Terrie Brady's character beyond this circumstance. Based on my many years of knowing her, I believe this situation does not fully reflect the person she has been throughout her life and career."); A-16b ("In spite of all that brings us to this moment, I know Terrie Brady to be a good person. . . . I offer this letter in that spirit of truth, respect for the Court, and faith that a full human life deserves to be seen in its entirety.").

Terrie Brady is now 70 years old and is shattered and ashamed that her actions have destroyed the very legacy she worked so hard to create. One person writes:

> As a result of her actions and the embarrassment it has caused her, it took months for Terrie to even face me. When I was finally able to see her, I told her I still loved her, and that in the end, things will work out for the positive, as long as she does what she can do to make things right . . . and I believe she has done just that.

Ex. A-17. She knows that nothing she can do will fully make up for her failures, but she has not given up.

Those who have written on her behalf say they are "stunned," "saddened and dumbfounded" (Ex. A-15, A-09 respectively) by her offense, but also note the remorse they have seen in her, *e.g.* Ex. A-25 ("Since this situation came to light, I have seen how much it has affected her. She has expressed sincere regret and deep shame for her actions, and she has spent a great deal of time reflecting on the harm caused."); *see also* Ex. A-06 ("From my vantage point, Terrie is not defined by the worst mistake she has made. She is defined by years of service, advocacy, and genuine concern for young people and for the future of our community. I believe she has the capacity to continue making positive contributions to society, to learn from this experience, and to use the lessons of this painful chapter to help others."); A-24 ("I am confident that her capacity for empathy, service, and personal connection will continue to benefit others in the years ahead.")

Uniformly, they express confidence that she will recover and again be able to be a force for good in Jacksonville. *See, e.g.,* Ex. A-23 ("It is truly heartbreaking that she ended her career this way and I pray she is give a chance to redeem herself."); *see also* A-10; A-05.

For these reasons and under these circumstances, a sentence of 31 months of probation, with eighteen months of home confinement as a condition of probation, would be "sufficient but not greater than necessary" to fully meet the purposes of 18 U.S.C. § 3553(a).

### (2) Respect for the Law, Deterrence, Public Safety, Rehabilitation

Under § 3553(a)(2), the sentencing court must also consider

> the need for the sentence imposed—
>
> > (A) to reflect the seriousness of the offense, to pro-mote respect for the law, and to provide just pun-ishment for the offense;
> >
> > (B) to afford adequate deterrence to criminal conduct;
> >
> > (C) to protect the public from further crimes of the defendant; and
> >
> > (D) to provide the defendant with needed educational or vocational training, medical care, or other correc-tional treatment in the most effective manner.

Terrie Brady has endured much in the time since the search warrant was executed almost two years ago, and the letter writers—many of whom have known her for decades--are well aware of the strain. *See, e.g.*, Ex. A-13 ("the emotional and physical stress she's felt"); A-19 ("I feel certain that her feelings of regret and remorse are overwhelming. I cannot imagine the terror she must feel . . . ."); A-07 ("I have witnessed her genuine remorse and commitment to making amends . . . ."); A-20 (Terrie "carries deep shame about her situation and the

disappointment her actions have caused those who believe in her. I imagine this is not easy for someone whose entire life has been devoted to integrity and service. At seventy years old, her career is irrevocably over.").

She has suffered in other ways as well, both the normal collateral afflictions associated with being charged (loss of banking relationships, credit lines, expenses of defense), but also by losing her teaching certificate and other means of financial support.[9] Because of her age, she is also subject to interruption or loss of certain government benefits if she is incarcerated.

In the present case, the stated goals of § 3553(a)(2)(A, B)—just punishment and general deterrence—are met in the proposed sentence. Whether she is incarcerated in a Federal institution or bound by home confinement, all will know that punishment has been imposed. This prosecution certainly shows that no one is above the law.

Of course, the goal of § 3553(a)(2)(C) (specific deterrence) is also advanced, as Terrie Brady will—at the end of her sentence and supervised release—be in no position to commit further crimes. At 70, Terrie Brady is not likely to need "edu-

---

[9] Her remaining liquid resources are being devoted to fulfilling any restitution obligations beyond her December payment of $1,328,695.28.

cational or vocational training" as envisioned by § 3553(a)(2)(D), though she may need ongoing medical care and counseling.

In the present case, the proposed sentence would be "sufficient but not greater than necessary" to fully meet the purposes of 18 U.S.C. § 3553(a).

### (3) Available Sentences

Under § 3553(a)(3), the sentencing court must also consider "the kinds of sentences available." In this case, despite the amount of the loss, the non-violent nature of the crime and Ms. Brady's deep remorse suggest that consideration of alternative sentences seems particularly appropriate.

The Supreme Court has long rejected the idea that a non-custodial sentence is necessarily "lenient." *See Gall v. United States*, 552 U.S. 38, 48 (2007) (upholding sentence of probation where PSR had calculated sentencing range under advisory Guidelines of 30-37 months); *See also e.g.*, *United States v. Del Campo*, 695 F. App'x 453, 458 (11th Cir. 2017) (as against an advisory guideline range of 46-57 months, noncustodial sentence not substantively unreasonable where district court shows its reasoning under 18 U.S.C. § 3553(a)).

In the present case, a non-incarcerative sentence would be "sufficient but not greater than necessary" to fully meet the purposes of 18 U.S.C. § 3553(a).

## (5) Sentencing Policy

Under § 3553(a)(5), the sentencing court should consider "any pertinent policy statement" issued by the Sentencing Commission. Undersigned counsel is aware of no such policy statements.

## (6) Avoiding Disparities

Under § 3553(a)(6), the sentencing court must also consider "the need to avoid unwarranted sentence disparities" among similarly situated defendants. Ms. George is similarly situated, though various sentencing factors are different (Ms. George managed the leave calculations, Ms. George received illicit funds two years earlier, the defendants are different in age, Ms. Brady pleaded after Ms. George, etc.).

In the present case, the proposed sentence would be "sufficient but not greater than necessary" to fully meet the purposes of 18 U.S.C. § 3553(a).

## (7) Restitution

Under § 3553(a)(7), the sentencing court must also consider "the need to provide restitution to any victims of the offense." Ms. Brady has already taken significant practical steps to provide restitution to the DTU, as the Court is aware.

Teresa Brady was the President of the DTU for over 20 years. Notwithstanding the offense at the core of this case, the wellbeing of the DTU was her chief priority throughout her tenure, and as many of the letter writers observed, it was truly her life's work. Once she understood the fact and amount of the loss she had caused and had come to the conclusion that she was criminally responsible for the loss to DTU, restitution was a central goal. She wants to assure that the DTU is able to fulfill its responsibilities to its membership, to the school system and to the community.

Therefore, during plea negotiations, "restoration" language was sought by Ms. Brady in hopes that whatever funds could be collected would be restored to the DTU:

> [I]f prior to the date of the sentencing hearing, the defendant pays a portion or all of the order of forfeiture, and if appropriate pursuant to Chapter 14, Section II.B. of the *Asset Forfeiture Policy Manual* (2025), the United States will request from the Money Laundering and Asset Recovery Section of the United States Department of Justice that the forfeited funds be applied to any restitution ordered by the Court to be restored to the victim.

[Doc. 72 at 12-13]

Under this provision Ms. Brady sought to assure—to the extent possible—that the DTU would receive these funds as part of the restitution it is owed. By

17

agreement the United States Attorney will recommend that the funds paid by Ms. Brady will be restored to the union.[10] This recommendation can be made once both a forfeiture order and judgment ordering restitution have been issued by the sentencing Court.[11]

After entering the negotiated plea, Ms. Brady took steps to secure the full amount of the agreed forfeiture and to pay it as promptly as possible. The full amount of Brady's forfeiture obligation was wired to the U.S. Marshals Service Seized Asset Deposit Fund within two months of her October plea on December 8, 2025.[12] *See* Doc. 80, PSR ¶ 85.

Even assuming the Department of Justice MLARS Chief grants restoration, however, an additional restitution obligation will remain. As outlined in the PSR,

---

[10] This language, to be clear, merely obligates one governmental entity (the United States Attorney for the Middle District of Florida) to *recommend* to another governmental entity (the Department of Justice MLAR Section), that the forfeited funds be applied to restitution and restored to the victim. Once the promised recommendation is made, neither the United States Attorney nor this Court may *require* the MLAR Section to comply with the recommendation.

[11] *See Asset Forfeiture Policy Manual* (2025) 14.II.B ("To request restoration, the USAO must send the Chief of MLARS a copy of the judgment in a federal criminal case containing the order of restitution and a copy of the forfeiture order, along with a written request signed by the U.S. Attorney, or a designee, that includes the representations outlined in Section II.B.2 in this chapter.").

[12] Receipt of the funds was confirmed on December 10, 2025, and the funds were placed in the SADF fund of the U.S. Marshals Service. [Doc. 80]

Ms. Brady will also be jointly and severally liable with Ms. George for the entire $2,600,235.99 loss to the DTU. *See* PSR ¶¶ 43, 100. While Brady does not have sufficient resources to pay the entire amount herself, she is attempting to resolve as much of that obligation as possible.[13]

In the matter of restitution, the proposed sentence would be "sufficient but not greater than necessary" to fully meet the purposes of 18 U.S.C. § 3553(a).

---

[13] Counsel for the Government and counsel for Ms. Brady are in discussions and hope to reach further agreement on the matter of restitution before sentencing.

**SUMMARY**

In summary, there are multiple factors which suggest that the requested sentence is appropriate. Although Ms. Brady broke faith with the DTU and its constituents, she served the organization faithfully over decades.

- By pleading guilty she has accepted responsibility for the loss to the DTU.

- In her words and acts she has demonstrated her deep remorse.

- By her voluntary liquidation of assets to pay the full forfeiture amount she showed her commitment to the cause she worked for her entire life.

- Additionally, she has no prior criminal record whatsoever;

- Because of her life history and her age, she is unlikely to reoffend; and

- The offense, though extended in time, is not representative of her demonstrated public and private integrity.

In light of these considerations, Defendant suggests that a sentence of 33 months of probation, with eighteen months of home confinement as a condition of probation, and a monthly restitution obligation of $1,000.00 would be "sufficient but not greater than necessary" to fully meet the purposes of 18 U.S.C. § 3553(a).

## CONCLUSION

For the reasons stated above, and based on the Plea Agreement, the PSR, and the other materials before the Court, Defendant requests that the Court impose a sentence of 31 months of probation, with eighteen months of home confinement as a condition of probation and a monthly restitution obligation of $1,000.00 except for any period of incarceration.

DATED at Jacksonville, Florida this 3th day of February, 2026.

BEDELL, DITTMAR, DeVAULT, PILLANS & COXE
Professional Association

By:  s/ Henry M. Coxe III
       Henry M. Coxe III
       Florida Bar No. 155193
       E-mail: *hmc@bedellfirm.com*
       Brian T. Coughlin
       Florida Bar No. 713732
       Email: *btc@bedellfirm.com*
       Allan F. Brooke II
       Florida Bar No. 994413
       Email: *afb@bedellfirm.com*
       John G. Woodlee
       Florida Bar No. 100990
       Email: *jgw@bedellfirm.com*
       101 East Adams Street
       Jacksonville, FL 32202
         (904) 353-0211
         (904) 353-9307 Facsimile

Counsel for Defendant Teresa Brady