UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                                                  Case No. 3:24-cr-251-MMH-SJH

TERESA BRADY and
RUBY GEORGE

## UNITED STATES' SENTENCING MEMORANDUM

Corrupt union boss Teresa Brady and her chief lieutenant, Ruby George, stole more than $2.6 million from the teachers of Duval County. Brady and George did not need the money – both were very well paid to run the union. They stole the money because they could; because they felt entitled to it; and because no one would challenge them.

Teachers and other education professionals placed their trust in Brady and George for over 20 years. They trusted them with their union dues drawn from hard-earned salaries. They trusted that Brady and George would fight for their rights and benefits as educators. While busy caring for the children of Jacksonville, these teachers trusted that the defendants – as the leaders of Duval Teachers United (DTU) – would put the teachers' interests first.

Sadly, Brady and George broke that trust. They betrayed the very people whom they were put in office to serve—teachers, paraprofessionals, and office staff. They pocketed their constituents' money for over a decade. They issued checks and payments for each other that they never earned. To cover their tracks, they buried

the payments in general line items of DTU's records, so that the union's board of directors never saw how much was pilfered. They lied to their own auditor. They lied to their own board. They lied to state regulators. They stole at will – treating DTU's treasury like their own piggy bank.

Of course, no one is defined solely by their worst acts. And no doubt the defendants' lawyers will muster their friends and family at sentencing to allocate about the defendants' finer qualities. These are fair considerations.

But in sentencing matters, it is important to remember the ancient maxim *corruptio optimi pessimal* (that is, the corruption of the best is the worst). While holding positions of great influence and trust, despite having loving friends and families, and despite wanting for nothing, Teresa Brady and Ruby George stole. They stole for years. They stole millions. They covered it up and would not have stopped if they had not been caught. They need to be punished.

For these reasons, the United States recommends that the Court impose a sentence of 36 months' imprisonment (within the Guidelines sentencing range) as to Teresa Brady.[1] Such a sentence would be sufficient, but not greater than necessary to fulfil the purposes of sentencing under 18 U.S.C. § 3553(a).

---

[1] The United States is not including a sentencing recommendation here for Ruby George, who has substantially assisted the United States in the prosecution of this case. Whether she continues to cooperate and the extent of that cooperation – through and including the date of her sentencing hearing – are relevant sentencing considerations for the prosecution team.

I.  **The Nature and Circumstances of the Offense and the Need to Reflect Its Seriousness, to Promote Respect for the Law, and to Provide Just Punishment – 18 U.S.C. § 3553(a)(1)-(2)(A)**

The statutory factors under 18 U.S.C. § 3553(a) support the United States' sentencing recommendation. Beginning with the "nature and circumstances" of Ms. Brady's offenses, this factor calls for a substantial prison sentence. As president of DTU, Brady was paid a salary but also permitted to take up to 42 days of leave per year; if unused, that leave could be sold back to the union. Dkt. 95 ¶ 19 (PSR). To cover up her shameless embezzlement of union dues, Brady worked with George to purportedly sell back leave that they did not have, but also to pay themselves bogus bonuses and sham reimbursements – all to justify on paper these illicit payments. *Id.* ¶¶ 14, 24-25.

No DTU employee or board member – apart from Brady and George – signed the checks for those payments or authorized payments from DTU's payroll services provider. *Id.* ¶ 29. This serial embezzlement was never disclosed by Brady and George to DTU's board. *Id.* ¶ 29. Indeed, at monthly meetings, the pair actively mislead the board, by misrepresenting how much accrued leave that they had and by obfuscating when questioned about selling leave back to DTU. *Id.* ¶ 32. Likewise, when DTU's auditor asked Brady and George for their accrued leave balances, George provided made-up figures of 753 days and 601 days, respectively, when in

fact, they had no leave. *Id.* ¶ 30.[2] The auditor later confronted Brady and George about cashing out more leave than they could possibly have banked (starting from – and accepting as true – the fake numbers provided by George). *Id.* ¶ 30. In 2017 alone, Brady purportedly cashed in 4,736 days of leave, a sum that would have taken her more than 14 years to accumulate.[3] In response to the auditor's inquiry, the duo lied again, claiming that the final amount of accrued leave was still being determined by the board. *Id.* ¶ 30.

Naturally, the auditor was barred from attending any DTU board meetings to present his findings. *Id.* And at Brady's direction, board members were not permitted to keep copies of DTU's financial statements to study and review. *Id.* ¶ 33; Ex. 1 at 5. *Id.* Not that their fraud would have been obvious from those financial statements – the illicit payments to Brady and George were buried in a general line item for salaries and payroll taxes. PSR ¶ 33.

Brady did not limit her false statements to DTU's board and its auditor. She also lied to the State of Florida's Public Employees Relations Commission (or PERC). *Id.* ¶¶ 34-35. As DTU's president, Brady had to certify the accuracy of an

---

[2] George kept track of her accrued leave and Brady was responsible for doing the same, but Brady says that she did not do so. PSR ¶ 33; Ex. 1 at 2 (report of R. George's proffer, attached hereto); Dkt. 98 at 7 n.3 (Brady Sent. Br.). Obviously, as the union's president, Brady had the last word on personnel issues and could have tracked her own leave or directed someone to do so for her. But an accurate leave count would have interfered with her plans to steal from the union. This is likely why, according to George, Brady specifically directed George not to provide their leave balances to DTU's payroll services provider and shredded a document that George had prepared for that purpose. Ex. 1 at 3.

[3] (4,736 days of leave ÷ 8 hours per workday) ÷ 42 days accumulated per year = 14.09 years to accumulate.

4

annual Employee Organization Annual Financial Statement, which included a disclosure of DTU's executive compensation. For several years, DTU's disclosures failed to include the fraudulent payments that Brady and George made to, or authorized for, one another. *Id.* ¶ 35.

For example, Brady certified as accurate DTU's statement for fiscal year 2020, which reported her salary as $151,286.72 and reimbursed expenses as $5,000. *Id.* ¶ 37. In reality, she received more than twice those amounts that year, specifically, $352,788.84. *Id.*

Rather than safeguarding the union members' money, Brady acted like it was hers to spend. No later than 2013 (and in the years followed), Brady had no accrued leave to sell; yet when she needed money, Brady told George how much she wanted (after taxes), and then George would initiate a payment to Brady for the equivalent value of leave days. *Id.* ¶ 22; Ex. 1 at 2. She then directed George to do the same for herself. *Id.* They did this whenever they wanted money. *Id.* at 3. George went along with the scheme because she liked getting the money; moreover, Brady could be difficult – often vicious. *Id.* at 4, 2.

Through a decade of deceit and deception, Brady and George stole more than $2.6 million from their DTU friends and colleagues. *Id.* ¶¶ 40-41. Brady's haul was at least $1,328,695.28; George's was at least $1,271,540.71. *Id.* ¶ 41.

The millions that Brady and George stole was not from some mega-corporation with a seven-figure annual budget for loss, spoilage, and waste. This was a local labor union whose mission is to fight for the rights and benefits of

5

educators. The money that they stole came from dues-paying, overworked, and underpaid schoolteachers. The stolen funds could have been used to negotiate higher salaries for educators, thereby attracting talented young people to the profession, resulting in real and needed change for Duval County schools. Instead, Brady and George spent the pilfered funds on themselves.

In sum, the nature and circumstances of their offenses are despicable. They reflect a blatant disrespect for the law, the union, its members, and the Jacksonville community. These are serious crimes that dictate serious consequences to afford just punishment.

## II. History and Characteristics of the Defendant – 18 U.S.C. § 3553(a)(1)

Ms. Brady's "history and characteristics" also support a substantial sentence. Like most white-collar defendants, she has no criminal history. Unlike most defendants, nothing in her past or present justifies, contextualizes, or explains her crimes.

Brady had a happy childhood, is college-educated, happily married, and has no drug or alcohol problems. PSR ¶¶ 69, 79, 71, 77. She rose to the top of her profession, leading DTU as president for more than two decades. *Id.* ¶ 86. Brady is the former county and state chair of a major political party and served on that party's national committee.

Notably, Brady is an individual – not just with influence – but also of means. She drives a Mercedes. *Id.* ¶ 86. She lives in Jacksonville's tony Avondale neighborhood in a near-million-dollar home. *Id.* ¶ 86. As DTU president, she was

6

paid more than $150,000 per year. *Id.* ¶ 86.[4] Her resources are such that – with sentencing approaching – she was able to write a check for more than $1.3 million to fulfill her forfeiture obligation to the United States. Dkt. 80.

In other words, Brady has no excuse for her crimes. She was not driven by financial dire straits, abuse, or addiction. Her history and characteristics show that she is a person who had it all. But she wanted more, so she stole it. These circumstances support a significant prison sentence.

### III. Need to Afford Adequate Deterrence – 18 U.S.C. § 3553(a)(2)(A)

The United States is satisfied that Ms. Brady will never be able to embezzle $2.6 million from an organization like DTU again. There is, therefore, no pressing need to deter her specifically from committing future crimes.

There is a pressing need, however, to teach influential people – like Brady – that breaching the public's trust for money will land you in prison. Within recent memory, public figures sentenced in this courthouse have benefited from downward variances from the Sentencing Guidelines. Sentencing is a fact-specific process that turns on the peculiarities of each case. Courts are owed great deference in

---

[4] According to the Florida Department of Education, in 2023 (when Ms. Brady resigned from DTU), average teacher salary in Duval County in 2023 was $53,947.19. *See* Teacher Salary Data 2023-24, www.fldoe.org/ accountability/data-sys/edu-info-accountability-services/ pk-12-public-school-data-pubs-reports/archive.stml (last viewed Feb. 2, 2026). Thus, Brady earned roughly 200% more than the average schoolteacher represented by DTU. *Id.* On Brady's watch, Duval County average teacher pay was below Florida's state-wide average, *id.*, which, in turn, was the lowest in the nation. *See* www.nea.org/resource-library/educator-pay-and-student-spending-how-does-your-state-rank/teacher (last reviewed Feb. 2, 2026).

sentencing matters and reasonable minds can disagree about the propriety of any Guidelines variance.

But in a high publicity case like Ms. Brady's, any significant Guidelines variance signals (unintentionally) that public figures can steal without any significant consequence. Principles of general deterrence support the imposition of hefty prison sentences for public figures like Brady who commit serious financial crimes. In this regard, "public officials are the prime candidates for general deterrence because they act rationally, calculating and comparing the risks and the rewards before deciding whether to engage in criminal activity." *United States v. Arroyo*, 75 F.4th 705, 708 (7th Cir. 2023) (affirming district court's conclusion that "a longer sentence for [appellant] was necessary to deter corruption at the margins").

## IV. Kinds of Sentences Available and the Sentencing Range under the Sentencing Guidelines – 18 U.S.C. § 3553(a)(3)-(4)

The United States' recommendation is also reasonable in light of the kinds of sentences available in this case. Ms. Brady pleaded guilty to mail and wire fraud conspiracy, wire fraud, mail fraud, and engaging in an illegal monetary transaction (money laundering). For those offenses, Congress has authorized sentences totaling up to 70 years' imprisonment. The recommended 36-month term of imprisonment is a modest fraction (4.2%) of the possible sentencing exposure in this case. That recommendation is also consistent with the Sentencing Guidelines. Again, 36 months' imprisonment would be a mid-Guidelines sentence.

Curiously, unlike Ms. George, Ms. Brady pleaded guilty to an additional money laundering charge, and yet, both have the same Guidelines range.  Under the grouping rules and circuit law, Brady's money laundering total offense level calculation cannot be increased by her obvious "abuse of a position trust" under Guidelines § 3B1.3.  This is because she abused her position as DTU president when stealing the loot, but not when laundering it.  *Cf. United States v. Barakat*, 130 F.3d 1448 (11th Cir. 1997) (restricting courts from considering relevant conduct when applying the abuse-of-a-position-of-trust enhancement).[5]  This enhancement naturally can be applied to Brady's fraud offense level calculation, which, as a result, is higher than the money laundering offense level; therefore, the fraud offense level controls under grouping rules.  *See* USSG § 3D1.3(a).

As a result of this quirk of Guidelines law, Brady and George have the same Guidelines sentencing range, even though Brady engaged in both fraud *and* money laundering, whereas George did not.

In short, the United States does not object to the Guidelines calculation in the PSRs, but simply notes that both defendants have the same sentencing range, even

---

[5] There is a circuit split on this issue and the Eleventh Circuit is in the minority.  *See, e.g., United States v. Duran*, 15 F.3d 131 (9th Cir. 1994) (in determining that abuse of trust enhancement applied, sentencing court properly considered conduct that was related as part of a common scheme or plan under §1B1.3(a)(2)); *United States v. Young*, 266 F.3d 468, 478 (6th Cir. 2001) (concluding sentencing court may consider conduct outside the count of conviction in applying abuse of trust enhancement); *United States v. Guidry*, 199 F.3d 1150, 1159 (10th Cir. 1999)(same); *United States v. Cianci*, 154 F.3d 106, 111 (3rd Cir. 1998) (sentencing court may consider uncharged conduct in applying abuse of trust enhancement); *United States v. Colozza*, 125 F.3d 687, 691 (9th Cir. 1997) (the test of whether the abuse of trust adjustment can be applied is whether it is "relevant conduct" as defined by the guidelines).

though Brady engaged in, and has been convicted of, additional serious criminal conduct.

## CONCLUSION

Nearly 70 years ago, then Senator John F. Kennedy, a champion of public sector unions, warned against union bosses like Brady and George. He lamented that corrupt union officials were "converting union treasuries for their own personal use and profit; financing their investments, hobbies, private affairs, and even their homes with dues contributed by members to strengthen their union; and obtaining this money either through questionable loans, so-called gifts, or outright larceny." John F. Kennedy, *Remarks to Chamber of Commerce Dinner, Lynchburg, Va.* (Apr. 4, 1957).[6]

Since Kennedy's time, this country has made great strides in combating labor union corruption. This case demonstrates, however, that the work goes on. For the reasons stated above, the United States respectfully requests that this Court sentence Teresa Brady to 36 months' imprisonment, which will serve as a stark

---

[6] *See* www.jfklibrary.org/archives/other-resources/john-f-kennedy-speeches/lynchburg-va-19570404 (last viewed Feb. 3, 2026)

10

warning to other public figures who are tempted to steal money that they are entrusted to protect.

                              Respectfully submitted,

                              GREGORY W. KEHOE
                              United States Attorney

                    By:  */s/ Michael J. Coolican*
                          MICHAEL J. COOLICAN
                          Assistant United States Attorney
                          USA No. 156
                          300 N. Hogan Street, Suite 700
                          Jacksonville, Florida 32202
                          Telephone:  (904) 301-6300
                          Facsimile:   (904) 301-6310
                          E-mail: michael.coolican@usdoj.gov