FD-302 (Rev. 5-8-10)

**FEDERAL BUREAU OF INVESTIGATION**



EXHIBIT 1

Date of entry    06/27/2025

   Ruby George (GEORGE), date of birth ▇▇▇▇1943, Social Security account number ▇▇▇▇▇▇▇▇, was interviewed at the United States Attorney's Office. GEORGE was interviewed pursuant to a proffer agreement, which is attached as a 1A. GEORGE's attorneys, Reid Hart and John Phillips, were present for the interview. Also present for the interview were Assistant United States Attorneys (AUSA) Tysen Duva and Kelly Milliron, Internal Revenue Service (IRS) Special Agent (SA) Chris Pekerol, Federal Bureau of Investigation (FBI) Forensic Accountant Kyle Stevens, FBI Records Examiner Melissa Stevens, and FBI SA Melissa Funderburk.

   At the start of the interview, AUSA Duva reviewed the proffer agreement with GEORGE. GEORGE, AUSA Duva, and GEORGE's attorneys signed the proffer agreement. GEORGE provided the following information:

   In approximately 1995, GEORGE started as a Staff Consultant with Duval Teachers United (DTU) and accrued 42 leave days per year. Unused leave days rolled over each year. In 1998, Andy Ford (FORD) was the DTU President. FORD wanted GEORGE to run for the position of Executive Vice President. A few years later, GEORGE officially obtained the position. In approximately 1998 or 1999, Teresa Brady (BRADY), also known as "Terrie," was elected as the DTU President.

   In or around the year 2000, the National Education Association (NEA) and American Federation of Teachers (AFT) merged. This required GEORGE to travel frequently for meetings. As such, GEORGE was unable to take time off from work. When BRADY and GEORGE assumed leadership of DTU, membership was low. BRADY and GEORGE recruited heavily to increase membership. BRADY received various awards for successfully increasing DTU's membership. DTU also received funding from the state because of the increased numbers in membership.

   Roy Miller (MILLER) was DTU's auditor for a period of time. After MILLER retired, Robert Thaggard (THAGGARD) became DTU's auditor. When THAGGARD

Investigation on  06/11/2025  at  Jacksonville, Florida, United States (In Person)

File #  194B-JK-3731745                                        Date drafted  06/16/2025

by  FUNDERBURK MELISSA

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

initially came on board, he met with BRADY and GEORGE together. The meeting did not go well. BRADY was very difficult and often could be vicious. THAGGARD later told GEORGE that he never wanted to meet with BRADY again. GEORGE gave THAGGARD leave balances for herself and for BRADY. GEORGE knew these balances were incorrect. THAGGARD had no way of knowing whether the leave balances provided were accurate or not.

Gary Avery (AVERY) and others served on DTU's budget committee. For a time, DTU was not in good financial standing because of low membership and because they had to take a mortgage out on the DTU building. When FORD retired, he wanted to be paid out in full for his unused leave days. The large payout was why a mortgage was taken against the building. Eventually, DTU's finances improved and the mortgage against the building was paid in full. Up until then, BRADY and GEORGE never took leave days because of their responsibilities to DTU. After DTU achieved a better financial standing, BRADY and GEORGE started to sell their unused leave days because the money was there. GEORGE did take leave for approximately two weeks for rotator cuff surgery.

GEORGE kept track of her own leave balances on a notepad. BRADY was responsible for keeping track of her own leave balance. GEORGE knew that in or before 2013, that she and BRADY were selling back leave days that they did not have. GEORGE knew that she was personally out of accrued leave days and assumed that BRADY was also out because they accrued the same amount of leave days. It was an open joke in the office that BRADY did not really have any leave days to sell. GEORGE and BRADY discussed their leave balances in private and intentionally kept AVERY out of those discussions.

When BRADY needed money, she would say something along the lines of I need to sell some days. BRADY would tell GEORGE how much money she needed after taxes and then GEORGE would initiate a payment to BRADY for the equivalent value of leave days. BRADY directed GEORGE to do the same for herself. The conversations about these payments primarily took place in person or over the phone. GEORGE knew she was out of leave days and that BRADY was out too. Selling the unearned leave was convenient. It was easier to go along with BRADY's request than to fight it, plus GEORGE was benefiting too.

BRADY would tell GEORGE she needed to sell a certain number of days, minus taxes, to net a certain amount of money and that GEORGE should do the same. One time BRADY needed approximately $20,000. GEORGE knew BRADY needed roof repairs and assumed the money was being used for the repairs. There was another instance when BRADY wanted to renovate her kitchen and requested a large payment. GEORGE said it was easier to go along with BRADY.

194B-JK-3731745

Continuation of FD-302 of (U) Interview of Ruby George & Proffer Letter , On 06/11/2025 , Page 3 of 5

BRADY hired a friend as a paralegal and gave her a $10,000 raise in one year. GEORGE did not approve or agree with BRADY's decision.

[GEORGE was shown Exhibit 10 - a Handwritten Note.]

The handwritten note was in GEORGE's handwriting and read "$20,000." GEORGE did not specifically recall what the payment amount was for, but knew it came out of leave BRADY did not have.

Because of the difference in their pay rates, when BRADY sold back unearned leave, GEORGE sometimes sold additional unearned leave hours to ensure the payouts they received were relatively close in dollar amount. The timing of the payments was just whenever BRADY or GEORGE wanted money.

[GEORGE was shown Exhibits 1a - Check Number 30776, 1b - Check Number 30775, 2a - Check Number 31112, and 2b - Check Number 31113.]

GEORGE said the checks looked like examples of the payments for unearned leave she was discussing. BRADY specified the dollar amount needed and asked GEORGE how many days would she need to sell. Payouts were received via direct deposit and paper checks. GEORGE said there really was no rhyme or reason as to why they used direct deposit or paper checks. However, if money was needed before payroll could be processed, then they would use paper checks. Checks were printed in the office. To initiate a direct deposit, GEORGE called Paychex and spoke to an assigned person. GEORGE told the person that BRADY needed to sell back a specific number of days. The person would process the request. BRADY and GEORGE expensed the payouts under "Salary" in QuickBooks.

[GEORGE was shown Exhibit 3 - Paychex Statements with and without leave balances.]

BRADY instructed GEORGE not to put their leave balances in Paychex. GEORGE created a document to put their leave balances in Paychex, but BRADY said not to use it and shredded the document.

[GEORGE was shown Exhibit 11 - A Leave Balance Document.]

GEORGE confirmed she had created the document, but it was not the document GEORGE was going to send to Paychex. GEORGE did not like to fight with BRADY.

[GEORGE was shown Exhibit 5 - DTU Staff Leave Value.]

GEORGE created the document and gave it to THAGGARD. None of the

108754

FD-302a (Rev. 5-8-10)

194B-JK-3731745

Continuation of FD-302 of (U) Interview of Ruby George & Proffer Letter, On 06/11/2025, Page 4 of 5

handwriting on the document is hers. The leave balances came from adding accrued days to original balances as if no days had ever been sold or taken. GEORGE made up the number of days listed by her name and BRADY provided the numbers listed by BRADY's name.

*[Second paragraph from Exhibit 5 was read to GEORGE.]*

GEORGE confirmed DTU officers' leave accrual was not capped. Accrued leave was not sold back at the rate that it was earned. Leave days were paid out based on their current payrate.

*[GEORGE was shown Exhibit 6 – DTU Audited Financial Statements.]*

GEORGE did not recall having a discussion with THAGGARD when his calculation showed that BRADY and GEORGE were out of accrued leave. GEORGE did not remember giving THAGGARD any executive leave balance numbers for the audit report other than Exhibit 5. GEORGE recalled the audit reflected positively of DTU's financial position.

GEORGE said receiving the money made life easier, so she went along with it. GEORGE never saw BRADY nervous until the day the FBI and IRS showed up. After the search warrant was executed at DTU, GEORGE and BRADY talked in person. BRADY asked GEORGE "what are they after, do you think it's about our leave?" GEORGE told BRADY that she did not know. BRADY said to GEORGE that she did not write any checks and paid her taxes. GEORGE had just retired before the search. When the FBI and IRS did not allow them to go back into their offices, GEORGE assumed the search was about what they had done with selling back unaccrued leave. GEORGE stated that BRADY was upset when she had to resign from her position.

When THAGGARD was conducting the audits, he told GEORGE that her and BRADY's leave balances should be documented, so the liability could be properly accounted for in the financial statements. GEORGE relayed this information to BRADY. BRADY told GEORGE no, and not to worry about it.

*[GEORGE was shown Exhibit 8 – Check Numbers 31888 and 31889.]*

These checks were the same as the others, payments for unearned leave. GEORGE was not sure why the memo lines said what they did. GEORGE thought the text recorded in the memo section was probably text left over from some previous check. GEORGE was not sure why the checks were not processed through payroll or why taxes were not withheld.

*[GEORGE was shown Exhibit 9 – Payroll Journal.]*

108755

194B-JK-3731745

Continuation of FD-302 of (U) Interview of Ruby George & Proffer Letter ,On 06/11/2025 ,Page 5 of 5

GEORGE did not know why the entries stated "bonus." GEORGE would have been the person to call Paychex. BRADY frequently told GEORGE how to code certain things; however, GEORGE did not remember if BRADY told her how to code the bonus entries. BRADY requested her payments be sent to two separate accounts.

[GEORGE was shown Exhibit 7 – PERC Form 2.]

GEORGE filled out the PERC Form. Monies received for leave payouts were not included in the amounts reported on the form. GEORGE said she pulled the salary dollar amounts from W2s. GEORGE told BRADY the amounts reported were not correct, because the leave payments were not included. GEORGE agreed that she and BRADY purposefully did not include additional monies received to hide the income. The PERC forms were sent through the mail. The last PERC form GEORGE completed may have been sent by email to make sure it was submitted on time; however, the originals with the signatures still had to be mailed.

BRADY and GEORGE did not tell the DTU Board members anything about their leave balances other than they had leave on the books and needed to sell it. During Board Meetings, Melisa James (JAMES) asked about BRADY and GEORGE's leave balances but was never provided an answer. GEORGE told JAMES to stop by the office and she would give JAMES the numbers, but GEORGE never intended to do that. GEORGE was just stringing JAMES along. After the meeting, BRADY commented to GEORGE "what's wrong with Melisa" and said that JAMES did not need to know about their leave. JAMES never followed up outside of the Board Meetings to get the actual leave numbers. GEORGE said that had JAMES followed up, GEORGE would have provided JAMES with a document "like this."

[Agent Note: GEORGE pointed to Exhibit 5 when she stated, "like this."]

GEORGE would have provided JAMES with made up numbers. Anytime anyone in the meetings asked about leave, if GEORGE started to answer, BRADY would jump in and take over the conversation to change the direction.

Board Members were not allowed to take budget documents home. GEORGE was told that a previous board member had a spouse who was an accountant. The individual would take the budget documents home for her husband to review, then she would come back to work and ask too many questions. As a result, BRADY dictated that budget documents were no longer allowed to be removed from meetings. There were also concerns of competition with another union.

108756